Page 13-1717 United Steel Paper Forestry, et al. v. Kelsey-Hayes Company, et al. Oral Argument, 15 minutes per side. May it please the Court. I represent three defendants here today. Kelsey-Hayes Company, TRW Automotive, Inc., and TRW Automotive Holdings Corp. We've raised a number of issues in our brief, ranging from... Excuse you. I've got... Some parts of your argument I understand under the Reese cases, but there's one part of your argument I do not understand under the Reese cases, and in fact it seems to defeat them. It seems to me your client is... It wants to... Your theory is that we're just changing the method of delivering these health care services, insurance, and so forth, and yet all that's been committed is funding of the accounts in 2012 and 2013, and then even worse, I mean, there seems to be this language of, yeah, and who knows how much longer we're going to be able to do this. So forget everything else, all right? I don't want you to respond to this question with anything else in the case. I do not understand how on that point we're not obligated under Reese, Yardman, everything in between, including prior case involving your client, to say, whoa, these have been vested under our case law. That commitment goes on, and this idea that you don't have to commit in 2014 or this other language you're reserving, I don't understand how we don't have to affirm on that. And let me just address that directly then. You know, the issue, as you've pointed out, Judge Sutton, in multiple cases, is that the health insurance arena is rapidly changing, and particularly with Obamacare and everything else, we really don't know what's going to be happening one year, two years, three years out. I think you're answering my question. So... It's vested. You agree it's vested. I thought your whole premise of your argument is there's vesting. Now we're just debating about how it's delivered, what the method is, and whether our changes are reasonable. But the idea that you don't have to commit beyond 2012 and 2013 or worse, you've reserved your right to just revoke it altogether, that's contrary with the position that it's been vested. Well, let me start with saying we've never stated that these benefits are vested. In essence, we recognize that the case law is somewhat... Is your view that your client can stop funding this year and in future years? We've never had to reach that point, Judge, because let me just give you an example. We could go back to the old program. If for some reason the HRA structure no longer works, if because of regulatory changes or the ones that doesn't work, we could go back to providing the benefits through some other mechanism. And if that's the case, then we would... Of course. But I guess I'm just not understanding why you won't just say right here, yes, we agree. The company has made a commitment to provide these health care benefits to these 400 people. And what's left to debate is how they're delivered, keeping in mind changes in law, changes in health insurance, changes in the medical profession. I get all that. What I can't quite understand is why you're not willing to take that off the table and then focus on the other stuff. And let me just say, as you know, Judge, in all likelihood there's other litigation involving these cases, and in those cases I have been authorized to say that, in fact, we are committed to continuing the program. I've never discussed it with the client in this particular context. And the other one... Okay, so I don't... It sounds like I'm asking for a concession, and I guess there's a way in which I am. But maybe the better way to put it is I just don't understand how that part of the injunction shouldn't be affirmed. Right. It seems to me that part is just consistent with Reese, it's consistent with prior Kelsey Hayes cases, it's consistent with everything since Yard Man. Well, I would respectfully disagree with that, Judge. And part of that, actually, I would stem almost from your dissent in the Noe case. If you look at what the issues are... Well, that's pretty useful as binding law. But let me use that as the starting point. Let's just talk about Yard Man for a moment. Yard Man is a case of contract construction on its face. I've lost the vesting debate. I agree with you. I don't agree with Yard Man. It doesn't make any sense to me. I think we're way out of step with the rest of the country. But I lost it, and this panel can't not follow that law. But let me just address, then, the argument you're raising, though. Let's just talk about the HRA funding structure going off into the future. We know that we funded the original $15,000. We know that we funded $4,800 the second year. We know that we had no basis to go forward on that because of the court's injunction issued last year. $4,800 for 2013, you think that's equivalent coverage for what the retirees had before? No, I think it's greater coverage. $4,800? Yes, sir. How is that? Okay, well, what we're dealing with here are Medicare supplement plans, and the absolute top Medicare supplement plan is called Supplement F, and the cost of that is $215 a month or about $2,600 a year. So what we're able to do is a retiree can take that $4,800. By the way, keep in mind they have $15,000 left over from the first year, and then they can buy that Supplement F plan, and they've got basically better coverage than they had under the collective bargaining agreement. On top of that, they can use additional money in the HRA to pay for Medicare B premiums, premium products, and we found that the retirees were, in fact, doing that. And, Judge Griffin, on top of that, we put evidence in the record that, in fact, no one ran out of money. There was ample money to pay for this, and the average fund left over in – It's a lot more reassuring if it's going to go on for future years. Correct, and that was the intention, Judge, but the issue in all of this is, again, we don't know what's going to happen in the future. I thought you made it known that you would have no funding in this year, 2014. That was never said. There was no guarantee, right? That's correct. Okay, well, how is zero equivalent coverage then? If you're a retiree and you hear the company's not making a guarantee for 2014, it seems to me pretty fair to be afraid of not having anything. But, in essence, that's not what the injunction said from the district court. The district court did not say TRW, thou shalt – Because they swept up – he swept up everything, but this would be included within it. So, surely, it's appropriate to say the company's enjoying to continue to providing health care coverage that's equivalent to what they were guaranteeing before. I'm just really having trouble understanding equivalent in the sense of reasonably – Right. That gets really powerful as long as you're willing to commit to continuing to do it. The minute you say you're not continuing to commit to do it, it becomes meaningless. I would disagree with that, Judge, because, again, these things – I mean, for example, any given time that we've got, in the past we've provided people insurance through Blue Cross Blue Shield or through Humana. The answer is sometimes it doesn't work and we change who the carrier is in that regard. In this particular case – We don't change by saying we're not guaranteeing anything next year. But in this particular case, that's not what the district court found. What the district court said is even during this time that you were overfunding this program – What does the record show as to your commitment after 2013? There is nothing in the record as to our commitment other than the fact that we've not guaranteed that. The retirees think there should be a commitment, so why should there not be an injunction saying the commitment continues? I just don't understand. All right. So then, okay, if that is what the injunction says, but that isn't what the injunction says – Because it covers everything. All right? I'm asking you why this discrete piece of the case can't be carved out. And once it's carved out, that does allow you to argue about the fact that we're committing to provide at least what they've gotten before. In fact, what we've done in 2012 and 2013 is better. I appreciate your question, Judge, and I think you're focusing it in a part that the injunctive order does not really focus on itself. Let me just go further on this. On the injunctive order itself, it talks about how this program was always improper. We're supposed to go back and make whole relief, which creates its own kettle of fish issues that aren't before you right now. But the issue was in year one where we overfunded this to the tune of, on average, about $12,000 per retiree. We were held that that violated the collective bargaining agreement, even though these folks got exactly the coverage that contained the collective bargaining agreement. Today is the first time I've understood how a judge could think that. I now understand why he thought that. I couldn't understand it when I read his opinion. Now I understand it because he's dealing with a lawyer in a company that's refusing to commit beyond a couple years. Judge, the only reason I'm refusing to commit is because, first of all, I did not anticipate this question today. And for me to get up here and say this company is committing to paying $40 million. You're appealing the injunction, aren't you? We are indeed appealing the injunction. Once the retirees are on notice that we are going to do this in the future, I mean, that's grounds for the injunction, isn't it? They don't have to wait for their benefits actually to stop when it's been clear that we have no guarantee in the future. I mean, that's— But, again, that's not for the injunction. If the injunction were to say— I know. You might have problems with the scope of the injunction. Right. But I thought you were arguing there shouldn't be an injunction at all. We do argue that. But going back to this very specific question Judge Sutton asked, if, in fact, you take the premise that these benefits are vested, we've provided the benefits. I thought you conceded that. I'm saying that— I thought you conceded that as well. Now you're not. I thought this was conceded. Well, we— I thought as a—I'm not going to give you advice. I thought it was pretty wise to concede it. Okay. But I, you know— I would certainly concede that the case law from this Court has not been favorable to us in this regard. Well, we can't overrule our published decisions on this panel, can we? But— How about this? Maybe this will get us around this injunction and maybe help make this a little more helpful. You want us to vacate the injunction entirely. Okay? That's what you would desire. Okay? Now, I don't think it's improbable to think that if we did that for you, they would not come back and say, Okay, Your Honor, fine. Under Reis 1 and 2, it's true. They have some authority about how they deliver this. But they clearly don't have authority under Reis 1 and 2 to not provide anything. So we would ask you to enter an injunction—this is the District Court on remand or to have us say it— that at a minimum, they're going to continue with this obligation to provide health care to the 400 retirees. So the original injunction has been vacated. How do you respond to that argument? My argument would be, then, that the injunction should certainly not read the way it says there. And what the injunction should say is, as long as defendant continues to fund this program, it's lawful. But if defendant fails to fund the program, assuming that it is vested, then it has satisfied its obligations under Reis 1 and Reis 2. So it satisfies them as long as it funds. But the minute it stops, they can be enjoined to continue to fund it. Right. All right. Well, that was what I was asking from the beginning. And I apologize for being unclear on that point. Okay. You know, the other point I have is that you've changed the benefits from Manna insurance or whatever the insurance is, and now you're going to HRA accounts. And you're saying, well, we're giving the retirees the same amount of money that they would have had before. But they argue, well, the risk now has been changed from the employer to the retirees. And that, therefore, it really the benefits aren't equivalent anymore because it's now their risk. What's wrong with that argument? We run into the Reis 2 argument on that one. First of all, keep in mind that even the best coverage that's out there, better coverage than they have now, runs in the neighborhood of $3,000 a year. And we initially funded these with $1,500 and then $4,800 after that. So the risk is $15,000. Excuse me. I said $1,500. That's good. Thank you. So we funded it with roughly five times the amount of money, in very large part, to ameliorate the risk that people would be concerned that there's not enough money here or would be. And, in fact, our experience is not one of these retirees ran out of money, and the average account balance when the court's order came down was on the order of $13,000. So we think the risk is minimal. And under Reis 2, it's well within the reasonableness standard. Can I ask a question? Are you or are you not agreeing that and conceding that there are vested benefits equivalent to the benefits that were the original benefits in the case, or not? You're not or you are or you don't want to say or what? He wants to reserve the right to challenge the Yardman line of cases, so he's just saying under current case law he can understand how they're vested, but that doesn't prevent them from arguing in bank or in the Supreme Court that Yardman's wrong. That's all you need to say. That's exactly right. We are reserving our right to challenge. Yardman, certainly as it's been applied in this circuit, we don't concede that they're vested, but we do concede the case law against us. You are or are not conceding that there are vested benefits that are equivalent? We do not concede that. You do not concede that. And your argument is what? Because Reis has intervened here? Well, our argument is that under the Reis reasonableness analysis, well, two things we're arguing. First of all, if you look at the contract here, what we're required to do is to contribute toward the cost of certain coverages described in there, and we believe that the structure actually does follow that. We fund it. We contribute to the cost. We provide the coverages in the contract. To answer my question, the bottom line answer is no, you do not concede that. That's correct. I do not concede it. I see my time is up. Okay. You'll get your full rebuttal. We'll hear from I think it's Mr. Israel. May it please the Court? Stuart Israel on behalf of the plaintiffs. I would like to first make my points about why I believe Reis does not control this case, and second, that even if it did, the reasonableness, unreasonableness question, that there is nothing in the record that supports Mr. Mersel's position. Can I ask you this question? So, you know, the Yard Man and On Forward, they're analogizing the vesting of health care benefits to an area where there's a very clear type of vesting, pension benefits. So with pension benefits, the day, you know, I retire, you can quantify that. You can say, well, your account has $1.1 million, or you can say under our agreement you will get, you know, $2,000 a month for the rest of your life, and that can't be diminished, and they're just really easy, pretty easy to implement because it's so easy to quantify. You just put a number and you follow it. I think you would agree with me with health care. It's complicated because health care changes from year to year. I mean, there are new devices, there's new ways of delivering health insurance, and of course there's new federal and state regulations. So it's a little harder to have a vesting. I mean, the vesting concept doesn't translate perfectly, but it can translate at the level of commitment. What strikes me as somewhat ironic about this case and the HRAs, it's the first time I've seen HRAs, is HRAs are the closest you can get to the pension analogy. So, I mean, if you and I could agree that on the year of retirement, your clients had, they were, Kelsey Hayes had said, you are going to get health care coverage for you and your spouse for life. We brought in an expert. We can tell you what that's worth. That's worth $3,500 a year as long as you live. I mean, so people could, you know, they may not be perfect, but you can imagine someone doing that, trying to account for health care inflation, and I think we would all agree that would be fair. You know, you can't diminish it. Whatever that amount is, it's good for life. Maybe it would have cost-of-living adjustments, accounting for health care inflation, but wouldn't we agree in the abstract that that was okay? Judge Sutton, in the abstract, I would agree with you. The typical collectively bargained pension. But why isn't that, so now we're into the details of what this HRA plan does because that, I totally get your point. They've committed not, they haven't committed to 14 and beyond. I think you understand we got that. But that just gets you back to the details of bringing some experts in to figure out how you fund these HRAs so it really is fairly delivering on the commitment in the same way a pension that's been vested would deliver on the commitment. Yeah, I think your question goes to the heart of why I do not believe that these concepts applied in REIS apply here. In REIS... Forget REIS. I'm helping you. The very best analogy any health care lawyer can ever have is to a pension. So I'm trying to work with that analogy. I'm accepting it. So why isn't this a fair way to go? Just make sure that you have someone quantifying it fairly so that they don't run out of money in 2018. Yes, I appreciate the help, and the concepts that you list are perfectly valid. But I don't think that they apply in this case because in this case... You're going to talk about mutual consent? Well, these sophisticated parties, even before I talk about mutual consent, the parties explicitly anticipated changes in state law, changes in federal law, changes in practicability, changes in benefits availability and benefits not being permitted, new plan options and new benefits negotiated. In these five mutual agreement clauses... What you're vesting is, you know, you have a new federal health care law that takes a plan that used to provide coverage for a couple from $3,500 a year and now because of preexisting conditions, community rating, other regulations, it now has to be $5,000 a year. They've got to deliver on that, even though no one knew that federal law would be passed 10 years ago. Well, there I disagree with you, Judge Sutton. We've been talking about health care for a year or two. The real question, it seems to me, is what does equivalency mean? That is, you may have to adjudicate the question from time to time what vested benefits, which are equivalent to previous benefits, means, and that's the general question that may have to be litigated. Is that all that is involved here? Judge Barrett, first I've got to disagree with you. The parties in their agreement contemplated that some benefits in existence at the time of these contracts might not be available for one reason or another, the things I listed, change in law, change in insurance companies, that sort of thing. During the term of the CBA? No. In the same way that they did not put a durational limit on retiree health care, they did not put a durational limit on the mutual agreement clause. Yardman does not apply to mutual consent clauses. I mean, Yardman is about the commitment to provide health care. What I would argue is that What would you say is vested? If it's not something that's equivalent that could be, we don't know what the future holds, and you'll have to decide something about that in the future when changes occur. But isn't that the best you can do to say that the vested benefits are some kind of equivalent benefits? I may be saying that under some circumstances, but I don't think that we get to that in this case because What should we say the standard is then? I think you start with the contract, Judge Merrick. And the contract lists medical, dental, optical, et cetera, et cetera. It lists seven or eight different kinds of coverages. And it promises those coverages that exist then, beginning at the time of retirement, and they shall be continued thereafter. Then it says, in the event that something interferes with the ability to provide that level of benefits, there is an equivalency clause. The parties will reach an equivalent of the impossible benefits by mutual agreement, which means the union must consent. What we're dealing with here is the company unilaterally deciding what's best. But a union consent clause only applies during the term of the CBA because unions don't represent retirees. Retirees don't pay union dues, and unions don't have obligations to represent retirees. Judge, I How would it work? You have 400 people. Every one of them could say, I'm person 399. I object. So now we create a plan for person 399? No, this question has been addressed in the various arbitration clauses, cases where unions have tried to arbitrate and have successfully, in some cases, arbitrated on behalf of retirees. The Amos case, for example, says that retirees can consent to the union to representation, or a mechanism such as Rule 23 can empower the union to represent retirees. But I would say we have an even narrower issue in this case. But the union cannot opt out. The retiree doesn't have to be represented by the union. I disagree here in this case because what is vested under this contract, based on what I would say is unambiguous language, is that the retirees have the right to the lifetime retirement health care, subject to alteration by consent of the union. What is vested? I suppose the union takes a totally unreasonable position about what's equivalent. Just suppose. Yes, that's not the case here. What do you do then? Well, there may be a duty assumed on the part of the union to act responsibly as the retirees represent. In the end, you're going to continue to do what you've been doing, which is litigate it every two or three years. Well, that's the— It's good for lawyers. Well, let me— Has anyone tried to mediate this case? I mean, it just seems so obvious that there should be a way to mediate it. They say they're giving enough money per year to more than account for what they've gotten in the past. It just seems like once they say that, there ought to be a way to work this out for 400 people. They are— Assuming the commitment goes on. Just assume that. Yes, and they are totally divorced from the human factor. Over 100-plus retirees have dropped out. People who for many years have had retirement health insurance, with the advent of the HRAs, for many reasons suggested in the record, like inability to navigate them or reading problems, they have not been covered. Is that an answer to why this can't be mediated? Is that what you're saying? I can say that we've had discussions. We've not had any mediation, but the company has been, I would say, obdurate. Mr. Israel, getting back to the analogy of pensions, if there were a collective bargain agreement that guaranteed a defined benefit retirement plan for these people, and the employer says, no, even though I've promised a defined benefit, I'm going to give these people an IRA of $10,000, or whatever it is, that I think will be the equivalent of it, would that be allowed? No. Typically, a collectively bargained defined benefit plan, as you suggest, is a multiplier of a dollar amount times years of service equals XL. But the employer would say, well, it's equivalent, and you can invest this money over the next 28 months. It's good for you. It gives you more flexibility. Well, that's the same argument here. Exactly. Is that allowed under pension law? No. Okay. Well, that's what they want to do here, right? Exactly. They want to decide what the benefit is. Our experts say that this will be the same, but it's a guess. It's a calculated guess. It's a calculated risk. And just as we find out that IRAs don't always pan out the same as defined benefits, and that's really one reason most employees don't like converting to an IRA. So, I mean, if we look at the pension analogy, is that a good way to look at it? I think that under this contract, once these retirees became vested and once the universe has been defined as being unalterable absent union agreement, that's what is vested. Even if the ñ I just might correct you, Judge Griffin. There are no experts here who say that this is equivalent. There's the opinion of the ñ They could find someone or something. Well, they submitted a declaration of their benefits director whose opinion is that the retirees are better off. We'll thank her for her opinion, but it's not an expert opinion. Can I ask you ñ I'm going back to ñ I think maybe this answer is responsive a little bit to Judge Griffin's question, because one answer to what he just said is that there's a statute, ERISA, that prohibits that. There's no comparable statute here, but this still takes you back to equivalency. I'm just wondering if we have this backwards. Why is it appropriate here to say, wait, this is vested in the Sixth Circuit case law sense. You get equivalency. Why wouldn't you have a fact-finding and hearing and evidence about what they're proposing and first ask whether it's equivalent? In other words, I would think the union ñ let's assume the union has this veto right, so let's accept your argument. Wouldn't the sensible way to do this be, if you can't mediate it, have the hearing, determine exactly what their commitment is, figure out whether it really is equivalent? Would you having arguments, no, it's not, it's more like an IRA and creates all this risk? They respond with, okay, fine, we'll put more money in or we'll change it, whatever, and then you decide whether the union's going to veto. It seems really funny to say, well, this isn't what we used to get. We're not going to have a hearing about whether it's equivalent. We're just vetoing now. We want the old system. So how would you be heard if it was sent back for more evidence? Because Judge Drain, he didn't feel he needed to get to all these details the way he read the case law, and I get it, but how would that hurt you if that was the approach? He said, which I think is absolutely true, that by any measure what they did could not be reasonable, and here's the comparison. I'd rather not have you do it in the context of Judge Drain because, remember, this was on summary judgment. Yes. They get the inferences on summary judgment, and I think that complicates things. So let's take that off the table. I'll take him off the table. So make it a finding. Just have a hearing. You like this judge. He's going to make findings about what's equivalent and what's not. If at the end of the day he says it's equivalent, then let's find out if the union wants to veto it. Why wouldn't we go that route? Here's what I think this court can do, and that is find as a matter of law that shifting from a full premium, comprehensive, company-paid, company-administered, one-stop group health plan, insurance plan, to a capped, limited, administrative shifting, risk shifting, terminable, malleable, uncertain, retiree paid first, wait for reimbursement, health reimbursement arrangement. Is this statement accounting for the inferences at summary judgment? I believe on this record it does account for it. There is nothing in the record that says that this plan is equivalent other than the benefits director's personal opinion. In contrast, we have the experiences of retirees that, as you've read in the brief, that are horrible, that are nightmares. When we get through with his questions, can I ask? No, I'm trying to follow up on yours, so go ahead. How widespread is this problem that we have in this case in our corporate culture, where you've got major employers like this, you've got old defined benefit plans, and now we have to confront, at least at some point in the future, perhaps a new day concerning health care. How widespread is this type of problem in our society? I'm not sure I can answer that empirically. I know there are a number of cases that this court has decided addressing long after the fact changes. And once again, unlike many of those cases, in this case the parties contemplated evolution. The parties were pragmatic, were practical. In Reese, the court filled a gap and came up with a practical solution where the parties did not have a solution. In this contract, the parties said what the solution is, mutual agreement. Well, in the last analysis that's so, but the fact is they do have a history that's reflected in the record where on occasion the company has come to the union, the union said yes, or even the very carrier changes that they cite as showing somehow it's not vested, the union acquiesced in those. The union is not interested in litigating every time there's some de minimis minor administrative change. This is a drastic catastrophe level change and forcing the union into litigating this. The company has never said how about if we make this change because it makes sense. What the company did by fiat was eliminate $16.6 million in their liability, shifting it to the retirees, even assuming they funded it forever at this level. But they won't even say that they're funding it at this level. If that's true, what is so problematic about having fact findings in a hearing that proves you're right about the lack of equivalence? I think if we had fact findings. Getting attorneys fees for the work. Yes, right. I hope that you uphold the attorneys fees. But if we had fact finding, I think it would be time consuming, expensive, and I think we would prevail on this record. But I also think that the record that exists now in the district court is sufficient for this court to find that this, the unambiguous contract language was breached by the company's conduct. That's what we look at here is the contract, don't we? Even if the contract may not work the best way it can, it may not make the best sense, we're still bound by the contract, right? Yes, the party's intent. And the company should not have signed the contract if they didn't want to be bound to it, right? Absolutely, Judge Griffin. Judge Mann, do you have any other questions? No. Thank you. I haven't gotten beyond page one of my answer. It's not uncommon. Maybe you could try to answer the question and ask about how widespread this problem is. It's a serious problem, obviously, for the future. How widespread is this between the retirees and large companies that have had defined benefit plans in the past? Well, obviously, we're not dealing with the defined benefit plan issue here in the pension context. That's not what this case concerns. But obviously, the concern of retiree benefits isn't just one that involves large companies. It involves small companies in the United States of America when you look at the Social Security funding, Medicare, and so forth. This type of problem for health care is widespread, would you say, with? Every employer, this entire country is grappling with the cost of dealing with health care and the cost of health care. And Judge Sutton has very eloquently put forward some of those issues, particularly in the REAST 2 decision. Because of all these changes, the advances in medical care, the increasing cost, people are trying to deal with it. One issue here, in fact, on rebuttal, Mr. Israel raised the issue. Before you move on, if we were to have factual hearings as to the equivalency, would we do that periodically? Or would there just be one hearing forever that would be held? I forget which judge here asked about the questions involving Kelsey Hayes and prior litigation. We have obviously been in litigation in the past. We do not anticipate it would be a yearly thing. As Mr. Israel pointed out, there may be changes. I'm just trying to see how this would work. I mean, I've seen defined benefit cases where defined benefit pensions have been changed to IRAs and maybe the employees have elected to the IRA. And then 10 years down the road, they find out, well, the actuary wasn't really correct on their assumptions. And I thought I would have so much money after 10 years and my retirement would be this. But guess what? All those assumptions were wrong. And guess what? I should not have switched from a defined benefit to an IRA to a defined contribution. But I'm stuck, so I'm trying to get out of it. Those are the cases I've seen. They would try to get out of it. But what they showed is the assumptions were wrong. Well, if we have a hearing, you know, on remand, is that hearing going to be final or is it going to be subject to being reopened in 5 years, 10 years? How would it work if we did that? It would have to be final unless there was some change to the structure down the road. I mean, the answer is the assumptions were wrong. But in essence, almost any case is like that. You take a damages case with future damages, the economist will come in and make projections about interest rate, discount rate. I know, but that's final. You know, that's final. You have a personal injury case, and the jury determines that future damages are half a million bucks. You don't come in 10 years later and say, no, you know, I thought my leg would get better, but I'm in a wheelchair and I really want another $2 million. It's final. And, I mean, that's the problem I see of going from defined benefits here of health insurance to we're going to give you so much money, and that's going to be good enough for you in the 5 years, 10 years, 15 years, 20 years. Well, what if their assumptions are wrong? Well, what we had argued perhaps not as clearly as we might below was that at this point, we know that nobody is out any expenses. In fact, people are ahead. Nobody is out now. Right. How about 10 years from now? Right. And the answer is if it turns out that we're wrong 10 years from now, then come back and address it then and argue that you even reasonably. I don't think so. I mean, I guess maybe we could put that in our order, but that would be very unusual to relitigate it. And the other thing I see is that you have some retirees that are not sophisticated, and they feel more comfortable of having the experts of the company figuring out which group insurance plans are better, which ones pay better, which are easier to deal with. When you put that burden on the retiree himself, you may have somebody who is 80 years old, 85 years old, and not real sharp on the health insurance industry to think that they can come up with the same decision that an experienced plan administrator can do for the company, I think is kind of a stretch too. And these retirees didn't really anticipate that they would have to become experts, particularly late in their years. To respond to that, Judge, Extend Health actually had a telephone conference with each of the retirees going through their plans and recommended plans that were best for them. And our experience is that retirees were overwhelmingly signing up for the Cadillac plans, so that isn't an issue that's really come to pass. Most of them are signing up for better coverage than they had to begin with. Okay. How about 10 years from now? I would expect the same thing. Actually, the reality is most people, once they sign up to a plan, tend to stay in that plan. I don't think anymore, but okay. Thanks, Judge. Is there anything? I mean, you just got questions. Was there one point that you really wanted to make? Let me just raise one, Judge, just to respond to your question. There was never any formal mediation. There were settlement discussions, and we are described as obdurate. And during those discussions, we did indeed commit to keeping this in place through the future. But, again, the case did not settle. We did not complete the settlement. Is it worth another run at it? We have a great mediator. We're always happy to talk settlement. All right. Well, it's a difficult case, so thanks for the excellent briefs. We appreciate it. Thanks for your excellent oral arguments. We'll work through it. The case will be submitted, and the clerk may call the next case.